UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DWAYNE REED,

                       Petitioner,

        *- against -*

JOSEPH T. SMITH, Superintendent, Shawangunk
Correctional Facility,

                       Respondent.

08 Civ. 9311 (NSR)(LMS)

**REPORT AND
RECOMMENDATION**

**TO: THE HONORABLE NELSON ROMAN, U.S.D.J.[1]**

On September 19, 2008, Petitioner Dwayne Reed, proceeding pro se, filed a habeas

petition pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his 2003 state court

conviction for one count of murder in the second degree, one count of attempted murder in the

second degree, two counts of criminal possession of a weapon in the second degree, three counts

of criminal possession of a weapon in the third degree, reckless endangerment in the first degree,

and unlawful wearing of a body vest. Pet. 1 - 2, D.E. 1.[2] Following two periods in which the

Petition was held in abeyance, on November 25, 2011, Petitioner filed his Second Amended

Petition. Second Am. Pet. 19 - 20, D.E. 17. In this Second Amended Petition, Petitioner asserts

_____

[1]By order dated January 5, 2009, this matter was referred to me by the Honorable Cathy
Seibel, U.S.D.J., to whom the matter was originally assigned. See Order of Reference, Docket
Entry (herein, "D.E.") 4.

[2]As noted, Petitioner asserts that he submitted his Petition to prison authorities for
mailing on September 19, 2008. Pet. 12. A petition filed by an incarcerated pro se petitioner is
considered to have been filed on the date the petitioner submits the petition to prison authorities
for mailing. See Noble v. Kelly, 246 F.3d 93, 98 (2d Cir. 2001).

the following four grounds for habeas relief: (1) trial counsel provided ineffective assistance; (2) Petitioner was denied due process and the effective assistance of counsel at resentencing; (3) the jury verdict was unreliable because the jury was confused by the Court's instruction to consider either a count of intentional murder or, in the alternative, a count of depraved indifference murder; (4) the trial court erred in declining to charge the jury on the affirmative defense of extreme emotional disturbance. See Second Am. Pet. at 5 - 18.

For the following reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the instant Petition should be dismissed in its entirety.

## I. BACKGROUND

A.    The Crime

On March 29, 2002, Petitioner, then twenty-two, shot and killed Chantay Bishop, who was nineteen, and attempted to shoot Ronald Neville, after Petitioner discovered that Bishop and Neville were romantically involved. See Sentencing Tr. (herein, "S") at 5, 13; Resp't's Mem. Ex. 1; Trial Tr. (herein, "T") at 1259, 2211. Bishop's mother, Wanda Johnson, testified that Petitioner and Bishop had dated for approximately three years. T: 846. According to Johnson, during that time, and until the late summer of 2001, Petitioner would visit Bishop at the house she shared with Johnson approximately four times a week. T: 845. Johnson testified that between late summer of 2001 and the date of Bishop's death, Petitioner made no visits to her home. T: 846. Although Petitioner continued to call Johnson's and Bishop's house up to three times a day, Johnson only saw Bishop take Petitioner's call once or twice between the end of summer 2001 and March 29, 2002. T: 847 - 848. Neville testified that he and Bishop became romantically involved in September 2001, and that their relationship was exclusive. T: 1236 - 37. However, Petitioner continues to assert, as he did at trial, that he and Bishop were still a

2

couple as of March 29, 2002.  See Second Am. Pet. 5 - 7; Pet'r's Reply, D.E. 29, at 1 - 2; T:
1734.

In the summer of 2001, Bishop purchased an apartment of her own in Yonkers with the
proceeds from a financial settlement she received after a car accident, although she did not move
in for some time.  T: 843, 860.  She began to furnish the apartment in January 2002, T: 860, and
by March 2002 she was staying at her apartment on the weekends and with her mother during
the week.  T: 851.  Neville testified that he and Bishop spent the night at her apartment on March
28, 2002, T: 1244, but that they were awakened on the morning of March 29 by Petitioner
banging on the windows.  T: 1249.  Petitioner attempted, unsuccessfully, to unlock the door of
the apartment, and went to the lobby of Bishop's building to wait for the building superintendent
to let him in.  T: 1250 - 51, 1746 - 47.  Neville, fed up with Petitioner's intrusion, found him
there, had a "peaceful" conversation with him in which Petitioner told Neville that he only
wanted to talk to Bishop to wish her well, and allowed Petitioner to come to Bishop's apartment.
T: 1250 - 51, 1338 - 39.  However, when Petitioner saw the rumpled sheets on Bishop's bed, he
became enraged and shot at Neville, who fled the apartment.  T: 1259 - 62.  Neville testified that
when he ran from the apartment, Bishop retreated to the bathroom and closed the door.  T: 1262.
At 8:45 A.M., Yonkers police found Bishop's body lying in a bool of blood on her bathroom
floor.  T: 814 - 16.

The medical examiner who examined Bishop's body, Dr. Kunjlata Ashar, testified at trial
that Bishop had suffered several bullet wounds: one from a bullet which passed through her
upper left arm and into her chest, spinal column and lungs, T: 1669; one which hit her face,
lodging in her nose, T: 1670; another which passed completely through her right forearm, id.;
and another grazing wound on the left side of Bishop's chest, T: 1681.  The track of the bullet

3

through Bishop's chest was consistent with Bishop having raised her arm in front of her face before the shot was fired. T: 1700. Dr. Ashar and Deputy Sheriff Anthony Tota, the People's ballistics expert, T: 1598, both testified that they found stippling near the bullet wounds on Bishop's upper left arm and right forearm. T: 1635, 1638, 1681, 1682. As Deputy Sheriff Tota testified, stippling is a pattern on skin around a gunshot wound caused by gunpowder. T: 1635. Stippling only occurs when the victim is shot from a distance of less than three feet. T: 1637. Thus, Tota's and Ashar's testimony indicates that the shots through Bishop's chest and forearm were fired from a distance of less than three feet.

When Petitioner was apprehended on the street near the Mount Vernon - Bronx border shortly after the shooting, he was carrying three concealed weapons and was wearing a bulletproof vest, as reflected in Counts 5, 6, 7, 9, 10, and 11 of the indictment. Resp't's Mem. Ex. 1; Resp't's Aff. in Opp'n 10 - 11 (citing T: 961 - 62, 969 - 70, 977 - 79, 1010); T: 897 - 98.

B.   State Court Proceedings

Within several months of the murder,[3] Petitioner was indicted on the following charges: murder in the second degree, committed with intent to kill (Count 1); murder in the second degree, committed "under circumstances evincing a depraved indifference to human life," (Count 2); attempted murder in the second degree (Count 3); criminal use of a firearm in the first degree, arising from Petitioner's use of an Intratec 9mm handgun to attempt the murder of Neville (Count 4); criminal possession of a weapon in the second degree (Counts 5 and 6);

_____

[3]Neither Respondent's Affirmation in Opposition nor the indictment itself, Resp't's Mem. Ex. 1, indicates on what date Petitioner was indicted. However, Respondent affirms that Petitioner filed an omnibus motion on June 6, 2002 (not included among Respondent's exhibits), which must have been filed after Petitioner's indictment. Resp't's Aff. in Opp'n 20. As Petitioner killed Bishop on March 29, 2002, this indicates that the indictment was filed sometime between March 29, 2002, and June 6, 2002.

4

criminal possession of a weapon in the third degree (Counts 7, 9, and 10); reckless endangerment in the first degree (Count 8); and unlawfully wearing a body vest (Count 11).  Resp't's Mem. Ex. 1.

Petitioner's trial commenced with jury selection on April 21, 2003.  T:1.  At the May 13, 2003, charge conference, the Court determined that Petitioner would not be charged with Count 4, criminal use of a firearm in the first degree.  T: 1732, 1976.  On May 15, 2003, as described in more detail in Section II.B.3 herein, the jury returned a verdict of guilty on the count of intentional murder in the second degree, not guilty on the count of depraved indifference murder in the second degree, guilty on the count of attempted murder in the second degree, guilty on the two counts of criminal possession of a weapon in the second degree, guilty on the three counts of criminal possession of a weapon in the third degree, guilty on the count of reckless endangerment in the first degree, and guilty on the count of unlawful wearing of a body vest.  T: 2211 - 13.

On July 8, 2003, Petitioner was sentenced to the following terms of imprisonment and post-release supervision: an indeterminate term of imprisonment of twenty-two years to life on the count of murder in the second degree (Count 1); a "definite" period of imprisonment of seven years on the count of attempted murder in the second degree, to be followed by a five year period of post-release supervision (Count 3); a "definite" term of imprisonment of ten years, followed by five years' post-release supervision, on each of the two counts of criminal possession of a weapon in the second degree (Counts 5 and 6); a "definite" term of imprisonment of five years with three years' post-release supervision on Count 7, criminal possession of a weapon in the third degree; an indeterminate term of imprisonment of two to six years on the count of reckless endangerment in the first degree (Count 8); a "definite" term of imprisonment

of three years with three years' post-release supervision on Counts 9 and 10, criminal possession of a weapon in the third degree; and a term of imprisonment of one year on the count of unlawfully wearing a body vest (Count 11). S: 26 - 29. The terms of imprisonment on Counts 1, 3, and 9 were to run consecutively to each other, S: 27, and concurrently with all other terms of imprisonment. S: 27 - 29.

Petitioner appealed his conviction to the Appellate Division, Second Department. Resp't's Mem. Ex. 2. In his appellate brief, Petitioner raised the same arguments as those in Claims 3 and 4 of the Second Amended Petition, alleging that the jury was confused by the alternative theories of murder presented in the jury charge and that the trial court erred in not charging the jury on Petitioner's affirmative defense of extreme emotional disturbance. See id. at 25 - 33. He also asserted an additional claim, not included in the Second Amended Petition, that the trial court made an incorrect statement of the law in its response to a jury question on geographic jurisdiction. See id. at 34 - 38. The Appellate Division rejected Petitioner's claims on the merits by a Decision and Order dated May 1, 2007. People v. Reed, 40 A.D.3d 660 (2d Dep't. 2007). Petitioner sought leave to appeal this decision to the New York Court of Appeals, but his application was summarily denied by that Court on June 25, 2007. People v. Reed, 9 N.Y.3d 849 (2007). In his letter application seeking leave to appeal, Petitioner challenged the Appellate Division's determination of only the claims relating to the murder charges and to the failure to charge on extreme emotional disturbance. Exhibit to Letter from Laurie Sapakoff to the undersigned (March 11, 2013)(Pet'r's Letter Application), D.E. 31-1, at 1 - 5.

On September 18, 2008, Petitioner filed a motion to vacate his judgment of conviction with the trial court pursuant to New York Criminal Procedure Law § 440.10. Resp't's Mem. Ex. 6. In that motion, he raised the same argument as in Claim 1 of the instant Petition, and

described more fully herein, namely, that he received ineffective assistance of counsel at trial. Id. On February 24, 2009, the trial court denied this motion as meritless. Resp't's Mem. Ex. 8. Petitioner sought leave to appeal this denial to the Appellate Division, D.E. 31 at 3 - 13, which that Court summarily denied on April 27, 2009. Resp't's Mem. Ex. 16.

On March 12, 2009, Petitioner filed a motion to vacate his sentence pursuant to New York Criminal Procedure Law § 440.20. Resp't's Mem. Ex. 9. Petitioner argued that the trial court had erred by sentencing him to "definite" terms of imprisonment on Counts 3, 5, 6, 7, 9, and 10, instead of to "determinate" terms of imprisonment. Resp't's Mem. Ex. 9 ¶¶ 2 - 5. Petitioner contended that "definite" and "determinate" sentences are not synonymous; rather, under New York Penal Law § 70.00(4), a "definite" sentence only refers to a sentence imposed for certain C, D, or E felonies for at most one year of imprisonment. Id. ¶¶ 4, 5. As each "definite" sentence imposed on Petitioner was longer than one year, Petitioner argued that the trial court had erred in its imposition of sentence. By Decision and Order dated April 13, 2009, the trial court granted Petitioner's motion to vacate his sentence only so that he could be resentenced to "determinate" terms of imprisonment. Resp't's Mem. Ex. 11 at 5.

On June 15, 2009, Petitioner appeared for resentencing, but his previously assigned resentencing counsel, William LaForgia, did not appear, and the Court was unable to locate him. Resentencing Tr. (herein, "R") at 2; Second Am. Pet. 9. The Court appointed another attorney, Paul Pickelle, to represent Petitioner at the proceeding, but Pickelle informed the Court that Petitioner wanted to have the matter adjourned because Petitioner had given some paperwork to LaForgia which Petitioner wished to recover prior to his resentencing. R: 2 - 3. The Court rejected Petitioner's request because, in accordance with the Court's written order on Petitioner's § 440.20 motion, the resentencing proceeding was intended only to correct the trial court's

mistaken use of the word "definite" with the correct term, "determinate." R: 3 - 4. At resentencing, Petitioner read a statement in which he argued that his sentences on those counts with determinate sentences should simply be vacated. R: 4 - 6. In the alternative, Petitioner argued that if he were to be resentenced on those counts, those terms of imprisonment should run concurrently with the indeterminate sentence on Count 1. R: 6. The Court resentenced Petitioner to the same terms of imprisonment as his original sentence, except that the Court referred to these terms as "determinate," not "definite." R: 7 - 9.

Petitioner appealed his resentence to the Appellate Division, proceeding through counsel. Resp't's Mem. Ex. 12. On appeal, Petitioner argued that he was denied the effective assistance of counsel at resentencing because Pickelle was unfamiliar with him, id. at 10, and that he was denied his Fourteenth Amendment Due Process rights because the Court failed to adjourn the matter to either locate LaForgia or permit Pickelle to become sufficiently familiar with Petitioner's case to provide effective assistance. Id. at 11 - 12. Petitioner also contended that the Court had arbitrarily interfered with his relationship with LaForgia by replacing him simply because he had failed to attend the proceeding. Id. at 12 - 14.

By Decision and Order dated June 7, 2011, the Appellate Division rejected these arguments on the merits. Resp't's Mem. Ex. 14. Petitioner sought leave to appeal, through counsel, in a letter application to the New York Court of Appeals in which he asserted that "the issue to be raised to the Court of Appeals is whether the (re)sentencing court interfered with the appellant's right to counsel and effectually deprived appellant of effective counsel at sentence." D.E. 31 at 2. The New York Court of Appeals summarily denied Petitioner's application for leave to appeal this decision on September 28, 2011. Resp't's Mem. Ex. 15.

C.    Federal Court Proceedings

Petitioner filed his original petition on September 19, 2008.  Pet. 12.  Petitioner originally raised only two claims, that the indictment confused the jury, leading to an unreliable verdict, and that the trial court erred in failing to instruct the jury to consider the affirmative defense of extreme emotional disturbance.  Pet. 4, 7.  Petitioner alluded to his pending § 440.10 motion, but did not include the ineffective assistance of counsel claim that was the subject of that motion as a basis for habeas relief.  See Pet. ¶ 12.  In a letter dated December 19, 2008, to the Honorable Cathy Seibel, United States District Judge, to whom the matter was originally assigned, Respondent noted that Petitioner's state court collateral attack was pending, and inquired of the Court whether the Petition would be held in abeyance to permit Petitioner to exhaust that claim. Letter from John J. Sergi to J. Seibel (Dec. 19, 2008), D.E. 5.  If the Petition was not stayed, Respondent sought an extension of time in which to respond.  Id.  Judge Seibel referred the matter to me, and stayed proceedings pending an initial appearance in the matter before me or my issuance of a revised scheduling order.  See id.  I denied Respondent's letter motion that the Petition be stayed by Order dated January 13, 2009, as a habeas petition may only be stayed if the petition contains both exhausted and unexhausted claims, and the instant Petition only contained exhausted claims.  Order, D.E. 6, at 4.

However, by letter dated January 15, 2009, Petitioner asserted that in fact he had requested a stay in an earlier letter which he alleged had been submitted to the Court with his Petition, but which the Court had apparently never received; in response to my January 13, 2009, Order, denying Respondent's request for a stay, Petitioner reiterated his request for a stay and asked that he be permitted to "supplement" his Petition after he had exhausted the ineffective assistance of counsel claim in his pending state court collateral attack.  Letter from Pet'r to the

9

undersigned (January 15, 2009) (docketed herewith).  In my January 22, 2009, Order, I construed Petitioner's letter as a request to amend his Petition to include the ineffective assistance of counsel claim.  Order, D.E. 7.  I granted Petitioner's request to amend his Petition to incorporate this claim, and stayed proceedings to permit Petitioner to fully exhaust this claim in his pending collateral attack.  D.E. 7 at 2 - 3.

By letter to the Court dated May 7, 2009, Petitioner asserted that he had exhausted his ineffective assistance of counsel claim, but sought to continue the stay of his Petition as he had filed a motion to vacate his sentence under New York Criminal Procedure Law § 440.20 while his Petition had been stayed. Letter from Pet'r to the undersigned (May 7, 2009), D.E. 8. Petitioner's § 440.20 motion had been granted to the extent that he was to be resentenced, and Petitioner sought to continue the stay of his Petition "until after I am resentenced and that matter is exhausted in the state courts." Id. I denied Petitioner's motion to extend the stay, lifting the stay and explaining that "a motion pursuant to 440.20 would address the petitioner's sentence, not the validity of his conviction," so there was no need for a continued stay. Id. On June 10, 2009, Petitioner filed his first Amended Petition, D.E. 10, in which he raised the two claims from his original Petition, as well as his ineffective assistance of trial counsel claim. See Am. Pet.

However, by letter to the Court dated July 9, 2009, Petitioner reiterated his request for a stay, and asserted that he was appealing his July 15, 2009, resentence on the ground that he was denied his right to counsel at that resentencing.  Letter from Pet'r to the undersigned (July 9, 2009), D.E. 12.  I granted Petitioner's request to stay his Petition again to permit him to exhaust the claim that he was denied the assistance of counsel at resentencing, and directed him to file an amended petition, including that claim, sixty days after the conclusion of that appeal.  D.E. 13.  I lifted that stay after Respondent, by letter dated November 2, 2011, advised the Court that the

state courts had concluded their consideration of Petitioner's appeal from his resentencing. See Letter from Laurie Sapakoff to the undersigned (Nov. 2, 2011), D.E. 14; see also Am. Order, D.E. 16.

On November 25, 2011, Petitioner filed his Second Amended Petition.  Second Am. Pet. 22.

## II.  DISCUSSION

A.      Standard of Review

"Habeas review is an extraordinary remedy." Bousley v. United States, 523 U.S. 614, 621 (1998) (citing Reed v. Farley, 512 U.S. 339, 354 (1994)).  To be granted a writ of habeas corpus from a federal district court, a petitioner must fully and carefully comply with the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Under the AEDPA, all state remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus.  28 U.S.C. § 2254(b)(1)(A); see also Picard v. Connor, 404 U.S. 270, 275 (1971).  In the interests of comity and expeditious federal review, "'[s]tates should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights."  See Coleman v. Thompson, 501 U.S. 722, 731 (1991); see also Daye v. Attorney General of the State of New York, 696 F.2d 186, 190 - 91 (2d Cir. 1982).  The exhaustion requirement of the federal habeas corpus statute is set forth in 28 U.S.C. § 2254(b), (c):

> (b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
> (A) the applicant has exhausted the remedies available in the courts of the State; or
> (B)(i) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the

rights of the applicant.

. . .

> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he [or she] has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b), (c).

The Second Circuit has adopted a two-stage inquiry to determine whether the exhaustion doctrine has been satisfied.  See Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981).  First, the petitioner must have "fairly presented" his or her federal constitutional claim to the appropriate state courts.  Picard, 404 U.S. at 275 - 76.  "A claim has been 'fairly presented' if the state courts are apprised of 'both the factual and the legal premises of the claim [the petitioner] asserts in federal court.'"  Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997) (quoting Daye, 696 F.2d at 191).  In other words, the claim must have been presented in a way that is "likely to alert the court to [its] federal nature."  Daye, 696 F.2d at 192.  The fair presentation requirement is satisfied if the state court brief contains phrases, such as "under the due process clause" or "under the Constitution," that point to the petitioner's reliance on the United States Constitution as his or her legal basis for relief.  Klein, 667 F.2d at 282 (internal citations omitted).  A claim may be considered "presented" even if the federal grounds were not explicitly asserted before the state courts if the petitioner, in asserting his or her claim before the state court, did one of the following: "(a) reli[ed] on pertinent federal cases employing constitutional analysis, (b) reli[ed] on state cases employing constitutional analysis in like fact situations, (c) assert[ed] . . . the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) alleg[ed] . . . a pattern of facts that is well within the mainstream of constitutional litigation."

12

See Daye, 696 F.2d at 194.

Second, having fairly presented his or her federal constitutional claim to the appropriate state court and having been denied relief, the petitioner must appeal his or her conviction to the highest state court. Klein, 667 F.2d at 282. Where a petitioner fails to present his or her federal constitutional claim to the highest state court, the claim cannot be considered exhausted. Id. (citing Williams v. Greco, 442 F. Supp. 831, 833 (S.D.N.Y.1977)). There is, however, another avenue available for exhaustion purposes. A petitioner who has failed to exhaust state remedies by pursuing a direct appeal may satisfy the exhaustion requirement by utilizing available state methods for collaterally attacking his or her state conviction. See Klein, 667 F.2d at 282 (citing Johnson v. Metz, 609 F.2d 1052, 1055 - 56 (2d Cir. 1979)). If collateral relief is denied, the petitioner may satisfy the exhaustion requirement by employing the state appellate procedures available for review of such denial. Id. at 283.

Generally, a state prisoner has one year from the date his or her conviction becomes final to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The limitations period is tolled while ". . . a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ." 28 U.S.C. § 2244(d)(2). The limitations period may also be equitably tolled if a petitioner can show that "extraordinary circumstances prevented him [or her] from filing his [or her] petition on time." Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000). After a petitioner has met these threshold requirements, a federal district court generally may hear "an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court" only if

13

the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

B.   <u>Petitioner's Claims</u>

    1.    <u>Petitioner's claim of ineffective assistance of trial counsel should be denied as meritless.</u>

First, Petitioner alleges that he was denied the effective assistance of trial counsel because his trial attorney did not attempt to introduce certain telephone records for calls between Petitioner and Bishop into evidence at trial.  Second Am. Pet. 5 - 9.  Petitioner contends that the telephone records show that his relationship with Bishop was ongoing.  <u>Id.</u>  Petitioner alleges that evidence which demonstrated that he and Bishop were still dating when he discovered her with Neville would have supported an affirmative defense of extreme emotional disturbance.  <u>Id.</u> at 5.  The telephone records would also have challenged the credibility of witnesses who testified that Petitioner and Bishop had broken up several months earlier.  <u>Id.</u> at 5 - 6.  Petitioner argues that if his attorney had moved the telephone records into evidence, his application for the Court to instruct the jury on the affirmative defense of extreme emotional disturbance would have been successful.  <u>Id.</u> at 8 - 9.

    a.    <u>Petitioner has exhausted this claim.</u>

Petitioner has exhausted this claim because he fairly presented the factual and legal bases of this claim to the highest available state court, as required by <u>Klein v. Harris</u>, 667 F.2d 274, 282 (2d Cir. 1981), discussed <u>supra</u>.  Petitioner raised this claim in his § 440.10 motion.  Resp't's Mem. Ex. 6.  Although Petitioner did not cite to a specific amendment of the United States Constitution in that motion, or cite to federal or state cases which could have indicated that he was alleging a federal, not a state, ineffective assistance of counsel claim, Petitioner used the

phrase "ineffective assistance of counsel," and described a fact pattern which suggests a Sixth

Amendment violation. Id. at 1, ¶ 4; see Daye, 696 F.2d at 194. He therefore apprised the state

court of the federal nature of his claim. Respondent does not suggest otherwise. Resp't's Mem.

1 - 5. Moreover, even if Petitioner's motion could have more clearly stated the federal nature of

this claim, the trial court denied this motion by evaluating Petitioner's claim under the federal

standard for ineffective assistance of counsel claims. Resp't's Mem. Ex. 8 at 2 - 3. Thus, the

essential purpose of the exhaustion requirement, to provide state courts with the first opportunity

to rule on a habeas petitioner's federal constitutional claims, has been satisfied. See Coleman,

501 U.S. at 731. Petitioner sought leave to appeal that denial to the Appellate Division, and

characterized his § 440.10 motion as alleging violations of his "State and Federal constitutional

rights," D.E. 31 at 5, but that application was summarily denied. Resp't's Mem. Ex. 16. I

therefore conclude that Petitioner has exhausted this claim.

        b.    Petitioner's ineffective assistance of trial counsel claim is meritless.

As the trial court evaluated this claim on the merits, the appropriate standard of review is

that of 28 U.S.C. § 2254(d)(1): this Court may not grant habeas relief on this claim unless the

state court's adjudication of the claim was contrary to, or an unreasonable application of, clearly

established federal law, as stated in Supreme Court precedent.

The Supreme Court's standard for ineffective assistance of counsel claims set out in

Strickland v. Washington, 466 U.S. 668 (1984), has two prongs. First, counsel's performance

must have been so deficient as to fall below an objective standard of reasonableness, as reflected

in prevailing standards of professional conduct. Id. at 688 - 89. Courts must be "highly

deferential" in reviewing counsel's performance; it is the defendant's burden to rebut the

presumption that alleged errors "might be considered sound trial strategy." Id. at 689 (internal

quotation omitted).  Second, counsel's errors must have prejudiced the defense.  Id. at 687.  To

establish prejudice, "the defendant must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at

694.

      The trial court's rejection of this claim in its denial of Petitioner's § 440.10 motion was in

no way contrary to or an unreasonable application of this precedent.  The Court first accurately

described the ineffective assistance of counsel standard in Strickland.  Resp't's Mem. Ex. 8 at 3

(citing Strickland, 466 U.S. at 687 - 94, and Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005)).

County Court Judge Hubert then applied this standard to the facts of Petitioner's claim, finding

that Petitioner had failed to establish either deficient performance or prejudice from the alleged

omission of counsel.  Resp't's Mem. Ex. 8 at 3.  Even if the phone records could have established

that Petitioner and Bishop were romantically involved at the time of the murder,[4] Petitioner still

could not have established the affirmative defense of extreme and outrageous disturbance under

New York State law.  Id. at 3 - 4.  The Court stated that New York State law requires more than

anger or hurt feelings to establish this defense: the defendant must show that he or she was

suffering from an emotional disturbance so extreme that it caused him or her to temporarily lose

self-control.  Id. at 4.  That is,

> [Petitioner's] claim of extreme emotional disturbance at trial did not fail because
> there was no corroboration that the relationship was ongoing.  It failed because
> there was no evidence he suffered from a mental infirmity not rising to the level

---

    [4]As Respondent notes, it is unlikely that the introduction of the phone records, which
only included the dates and durations of calls between Bishop's phone number and Petitioner, not
the contents of those conversations, would have sufficed to establish a continuing romantic
relationship.  Resp't's Mem. 4.

of insanity at the time of the homicide. It failed because his conduct was inconsistent with the loss of control associated with extreme emotional disturbance.

Id.

Since the phone records would not have indicated that Petitioner's conduct at the time of the murder reflected the loss of control necessary to establish that he was acting under an extreme emotional disturbance, Petitioner's attorney's failure to admit them did not prejudice his defense. As discussed in my analysis of Petitioner's fourth claim herein, Section 4, infra, the evidence adduced at trial did not establish that Petitioner experienced a mental infirmity not rising to the level of insanity at the time of the murder. The introduction of phone records, and the inference that Petitioner and Bishop were still somehow involved, would not have changed that.

As the state court's rejection of this claim was not contrary to or an unreasonable application of Strickland, I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied.

2.      Petitioner's claim that he was denied due process and the effective assistance of counsel during resentencing should be denied.

Next, Petitioner asserts that the trial court's failure to grant him an adjournment at resentencing forced him to be represented by an attorney who was unfamiliar with his case, and deprived him of his right to counsel and to due process of law. Second Am. Pet. 9 - 11. Petitioner had given LaForgia documents which included his § 440.20 motion, his legal research, and "pre and post conviction vocational and educational achievements." Id. at 9 - 10. Petitioner intended for his attorney to submit these documents to the Court in support of a motion to resentence Petitioner to a reduced sentence. Id.

17

Petitioner also alleges that the trial court's failure to either adjourn the resentencing to permit his original attorney to appear, or to permit replacement counsel to become familiar with the case, denied him due process.  Second Am. Pet. 11.

          a.     <u>Petitioner has exhausted his ineffective assistance of counsel at resentencing claim, but not his due process claim.</u>

Petitioner has exhausted the claim that he was denied the effective assistance of counsel at resentencing by raising it on direct appeal from his resentencing.  Resp't's Mem. Ex. 12.  The Appellate Division rejected Petitioner's ineffective assistance of counsel claim on the merits, finding that "there is nothing in the record that would support the defendant's current arguments that he was deprived of his right to the effective assistance of counsel."  Resp't's Mem. Ex. 14 at 2.  The Appellate Division's decision did not mention the claim that the trial court had deprived Petitioner of due process, but that court affirmed Petitioner's resentence, thus implicitly rejecting Petitioner's due process claim on the merits.  See <u>Harrington v. Richter</u>, 562 U.S. __, 131 S.Ct. 770, 784 - 85 (2011)(state court's summary rejection of petitioner's appeal was an adjudication on the merits for AEDPA purposes); <u>see also</u> <u>Johnson v. Williams</u>, No. 11- 465, 568 U.S. __, slip op. at 10 (Feb. 20, 2013)("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits–but that presumption can in some limited circumstances be rebutted").  In his letter application, through counsel, to the Court of Appeals, Petitioner stated that "the lower court resentenced the appellant without the benefit of counsel and refused the appellant's request for an adjournment for his counsel to appear," and framed the issue on which leave was sought as "whether the (re)sentencing court interfered with the appellant's right to counsel and effactually deprived appellant of effective counsel at sentencing." D.E. 31 at 2.  The letter

application attached the lower court's decision and the appellate briefs. Id. The New York State Court of Appeals summarily denied Petitioner's application for leave to appeal that decision. Resp't's Mem. Ex. 15. Thus, Petitioner has exhausted the claim that he was denied the effective assistance of counsel at resentencing by fairly presenting the factual and legal bases of that claim to the highest available state court.

However, Petitioner has not exhausted his claim that the trial court's denial of an adjournment of the resentencing constituted a denial of due process because he did not fairly present it to the New York Court of Appeals. Although Petitioner raised this claim in his appellate brief on direct appeal of his resentencing, Resp't's Mem. Ex. 12 at 9, 11 - 12, his letter application to the Court of Appeals made no reference whatsoever to due process; instead, Petitioner framed the issue on which he sought leave to appeal as a denial of the effective assistance of counsel. D.E. 31 at 2. Although Petitioner enclosed his appellate brief with his letter application, this Circuit has made clear that a letter application which argues some claims raised to the lower court, but not others, does not fairly present the unmentioned claims to the Court of Appeals, even if the letter application attaches the appellate brief. See Jordan v. LeFevre, 206 F.3d 196, 198 - 99 (2d Cir. 2000)("Counsel may not transfer to the state courts the duty to comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave."); Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991). Thus, I conclude that Petitioner has not exhausted the claim that the trial court's denial of his request for an adjournment denied him due process of law. Petitioner no longer has a state court remedy for this claim; he could not raise this claim in a § 440.20 motion because it was already rejected on the merits (at least implicitly) by the Appellate Division on direct appeal. N.Y. Crim. Proc. Law § 440.20(2). Because Petitioner has deprived the state courts of a full

19

opportunity to review the merits of this claim, I deem this claim to be exhausted but procedurally

defaulted.  See Coleman v. Thompson, 501 U.S. 722, 732 (1991).  Petitioner has not established

cause for the default or prejudice from the underlying error, or alleged that he is actually

innocent.  See Bousley v. United States, 523 U.S. 614, 622 (1998).  Therefore, I conclude, and

respectfully recommend that Your Honor should conclude, that Petitioner's claim that the trial

court denied him due process at resentencing should be denied.

> b.    Petitioner's claim of ineffective assistance of counsel at resentencing
> should be denied as meritless.

As the state court adjudicated the exhausted claim arising out of Petitioner's resentencing

on the merits, AEDPA's deferential standard of review applies: this Court may not grant habeas

relief unless the state court's decision was contrary to or an unreasonable application of clearly

established federal law, as stated in Supreme Court precedent.

Petitioner contends that his representation by replacement counsel at resentencing was

deficient because Pickelle was unfamiliar with the case and did not have access to certain

documents Petitioner had given LaForgia.  Second Am. Pet. 9 - 11.  Petitioner intended for his

attorney to use those documents, which included legal research and pre- and post-conviction

vocational and educational achievements, in support of a motion at resentencing for a lesser

sentence.  Second Am. Pet. 10.  In Petitioner's Reply, he contends that these documents include

"grounds for mitigation," and argues that the resentencing court had originally indicated he

would be permitted to raise these grounds at resentencing.  Pet'r's Reply, D.E. 29, at 4 - 5.

Although Petitioner concedes that at the resentencing proceeding the Court stated that Petitioner

would be resentenced to the same terms of imprisonment even if he had raised these arguments

for leniency, Second Am. Pet. 11, Petitioner contends that his attorney's failure to argue these

mitigating factors at resentencing nonetheless constituted ineffective assistance of counsel.

As discussed supra, in order to establish a claim of ineffective assistance of counsel, a defendant must show that his attorney's performance fell below an objective standard of reasonableness, as reflected in prevailing standards of professional conduct, and that this deficient performance prejudiced the defense. To establish prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Here, Petitioner has not stated with specificity how Pickelle's performance was deficient, other than asserting that Pickelle was unfamiliar with his case. I assume that Petitioner is alleging that his attorney was deficient because he did not move for a reduced sentence or supply the Court with the documentation that Petitioner characterizes as mitigation. Although Petitioner argues in his Reply that the Court intended for him to be able to make such a motion at resentencing, and that the Court adjourned his resentencing from the date on which LaForgia was appointed to June 15, 2009, specifically to permit LaForgia to develop the basis for such a motion, this characterization of the resentencing court's plan for the June 15 proceeding is not reflected in the record available to this Court.[5] Pet'r's Reply 4 - 5. The transcript of the resentencing reflects that, as Pickelle stated he explained to Petitioner prior to the proceeding, R: 2 - 3, and as the resentencing court stated at the proceeding, R: 3, the proceeding was being conducted solely to implement the limited relief that Petitioner had been granted in the Court's written Order on Petitioner's § 440.20 motion. Resp't's Mem. Ex. 11 at 5. In that Order, the

---

[5]Respondent informed the Court by letter dated March 11, 2013, that a transcript of the proceeding at which LaForgia was assigned to represent Petitioner is not available. D.E. 31.

Court granted Petitioner's motion "to the extent that he shall be brought before this Court in accordance with the provisions of Correction Law § 601-a for the purpose of having his sentence on counts 3, 5, 6, 7, 9 and 10 of the indictment corrected to reflect that they are for 'determinate' rather than 'definite' terms of imprisonment." Id.

Petitioner has failed to show that Pickelle's failure to make a motion for a reduction of sentence which would not have been entertained by the Court was not a strategic decision, so he has failed to show that his attorney's performance was deficient.  Moreover, even if Pickelle's failure to make such a motion could somehow constitute an error, Petitioner has not established to a reasonable probability that but for his attorney's failure to make such a motion, Petitioner would have received a lesser sentence.  Indeed, given the Court's statement that the resentencing was only for the limited purpose of correcting terminology, any such motion would have had little chance of success.  R: 3.

For these reasons, the Appellate Division's rejection of this claim was not contrary to, or an unreasonable application of, Strickland.  I therefore conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied.

3.      <u>Petitioner's contention that the indictment and jury charge confused the jury</u>
        <u>should be denied.</u>

Petitioner's third claim in his Second Amended Petition is that the trial court erred by submitting to the jury a verdict sheet in which Petitioner was charged with intentional and, in the alternative, depraved indifference murder,[6] a so-called "twin-count indictment."  Second Am.

---

[6]Under New York State law, a person is guilty of intentional murder in the second degree when, "with intent to cause the death of another person, he [or she] causes the death of such person or of a third person." N.Y. Penal Law § 125.25(1).  A person is guilty of depraved indifference murder in the second degree when, "under circumstances evincing a depraved

Pet. 12 - 13. According to Petitioner, the trial court should instead have dismissed the depraved indifference count prior to jury deliberations.  In addition, Petitioner contends that the trial court should not have instructed the jury that if the jury found Petitioner guilty of intentional murder, it must then acquit him of depraved indifference murder, as that instruction allegedly "usurp[ed] the jury's fact-finding function" and "left the jury uncertain." Id. at 13 - 14.

The verdict sheet instructed the jury that "if you find the Defendant not guilty of [intentional murder], you must go on to consider [the count of depraved indifference murder]. However, if you find the defendant [sic] guilty of [intentional murder] you <u>must</u> find the Defendant not guilty of [depraved indifference murder]."  Resp't's Mem. Ex. 17 (emphasis in original).  The verdict sheet was submitted to the jury following the trial court's thorough charge, which included instructions on the People's burden of proof, the appropriate standard of proof, and the elements of each crime.  T: 2082 - 86; 2109 - 2142.  On the second day of deliberations, the jury submitted a note to the court which stated that the jury had reached a verdict.  T: 2207. The jury then reentered the courtroom, and the judge then began to inquire of the foreperson as to the verdict on each count.  T: 2208 - 09.  The foreperson stated that the jury had reached a verdict of guilty on the count of intentional murder.  T: 2209.  However, when the judge asked the jury's verdict on the count of depraved indifference murder, the foreperson stated, "We did

---

indifference to human life, he [or she] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."  N.Y. Penal Law § 125.25(2).
      "Depraved indifference murder is not a lesser degree of intentional murder."  <u>People v. Suarez</u>, 6 N.Y.3d 202, 211 (2005).  Instead, the two crimes correspond to conduct which reflects different but equally morally reprehensible mental states. <u>Id.</u> at 207. "Indifference to the victim's life . . . contrasts with the intent to take it." <u>People v. Payne</u>, 3 N.Y.3d 266, 270 (2004). Depraved indifference murder when only one person is endangered is "rare." <u>Suarez</u>, 6 N.Y.3d at 211.

not answer that." Id. The trial court then instructed the jury as follows:

> Ladies and gentlemen of the jury, if you look at the verdict sheet, I will read to
> you what it says, 'if you find the defendant not guilty of [intentional murder], you
> must go on to consider [the charge of depraved indifference murder]. However, if
> you find the defendant guilty of [intentional murder] you must, underlined, find
> the defendant not guilty of [depraved indifference murder].'
> I'm not going to interfere with the deliberations. The choices are all yours.
> Nothing changed. I will send you back into the jury room. When you finish with
> deliberations, let us know and we'll bring you right out.

T: 2209 - 2210.

Petitioner's attorney then asked for a mistrial "based upon the irregularity of the
rendering of a verdict," which the trial court summarily denied. T: 2210. When the jury
indicated again that they had reached a verdict, and reentered the courtroom, the trial court again
inquired of the foreperson as to the verdict on each count. T: 2211. The foreperson stated that
the jury's verdict was guilty on the count of intentional murder and not guilty on the count of
depraved indifference murder. Id. After the jurors were excused, Petitioner's trial counsel again
moved for a mistrial based on verdict irregularity, which was again summarily denied. T: 2217.

Petitioner's claim does not present a federal constitutional claim cognizable on habeas
review because he has not established that any error of state law in the submission of the twin-
count indictment was so severe as to deprive him of due process.[7] Although, as Petitioner states,
twin-count indictments are "disfavored" by New York state courts, they are not prohibited
entirely. See People v. Suarez, 6 N.Y.3d 202, 215 - 16 (2005). In Suarez, the Court of Appeals

_____

[7]Nor does Petitioner expressly claim that these instructions violated his federal
constitutional rights; instead, he argues that New York State law disfavors the use of twin-count
indictments, so the trial court erred in failing to dismiss one of the two murder counts prior to
charging the jury. Second Am. Pet. 12 - 14. He claims it was "error" for the trial court to
instruct the jury on both counts. Id at 12. The closest Petitioner comes to expressly asserting a
federal claim is his argument that the trial court's instructions interfered with the jury's fact-
finding function and caused an "unreliable verdict." Id. at 12 - 14.

24

stated that "where twin-count indictments are lodged, trial courts should presume that the defendant's conduct falls within only one category of murder and, unless compelling evidence is presented to the contrary, dismiss the count that is least appropriate to the facts." Id. at 215 (internal quotation and citation omitted). "[A] one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder." People v. Payne, 3 N.Y.3d 266, 272 (2004). A one-on-one shooting in which the defendant shoots the victim repeatedly is even less likely to constitute depraved indifference murder, as the repeated shots confirm the defendant's intent. Id. Here, the medical and ballistics evidence adduced at trial showed that Bishop was shot multiple times, and that two of the shots were fired from a distance of less than three feet. See Section I.A, supra. However, even if the trial court did err in submitting the depraved indifference murder charge to the jury, as Petitioner was not convicted of depraved indifference murder, any such error would not rise to the level of a due process violation.

In addition, Petitioner's complaint that the trial court's oral instruction to the jury contradicted the verdict sheet, confusing the jury and leading to an unreliable verdict, does not present a claim of either state law or federal constitutional error, as it is based on a misstatement of the record. The trial court did not offer a contradictory instruction, but merely re-read the relevant portion of the verdict sheet aloud to the jury, and then carefully stated that he "was not going to interfere with the deliberations. The choices are all yours." T: 2210. The trial court also did not instruct the jury to reach a particular verdict, Second Am. Pet. 13; it instructed them in such a way as to avoid an inconsistent verdict. As the jury reached a verdict of intentional murder, and acquitted on depraved indifference murder, the jurors were evidently not confused by these instructions. Thus, Petitioner has failed to establish that the court's oral jury instructions qualify as error of constitutional dimension for which habeas relief may be granted.

Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied.

4.      <u>Petitioner's claim that the trial court erred in failing to charge extreme emotional disturbance should be denied.</u>

Petitioner's final claim for habeas relief is that the trial court erred in declining to charge the jury with the affirmative defense of extreme emotional disturbance on the counts of intentional and attempted murder. Second Am. Pet. 14. I conclude that this claim should be denied because Petitioner has not established that the state court made any error in declining to instruct the jury on this defense, let alone an error of federal constitutional magnitude which would be cognizable on habeas review.

"A jury charge in a state trial is normally a matter of state law and is not reviewable on federal habeas corpus absent a showing that the alleged errors were so serious as to deprive [the] defendant of a federal constitutional right." <u>U.S. ex rel. Smith v. Montanye</u>, 505 F.2d 1355, 1359 (2d Cir. 1974); <u>see</u> <u>also</u> <u>Cupp v. Naughten</u>, 414 U.S. 141 (1973); <u>DelValle v. Armstrong</u>, 306 F.3d 1197, 1200 - 01 (2d Cir. 2002). In order to rise to the level of a due process violation, the challenged jury instruction must have "so infected the entire trial that the resulting conviction violates due process." <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991)(quoting <u>Cupp</u>, 414 U.S. at 147). To violate due process, such instructions must have rendered the entire trial fundamentally unfair, but "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation," and the Supreme Court has therefore "defined the category of infractions that violate 'fundamental fairness' very narrowly." <u>Dowling v. United States</u>, 493 U.S. 342, 352 (1990). This is not to say that an erroneous state court jury instruction can never violate due process. "The fact that 'federal habeas corpus relief does not lie for errors of state

26

law,' <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), does not mean, however, that errors under state law cannot result in cognizable violations of a constitutional right to due process. What due process requires will often depend on what state law is." <u>Davis v. Strack</u>, 270 F.3d 111, 123 (2d Cir. 2001).

This Circuit has adopted a three-step test to determine whether a trial court's failure to give an instruction on a particular defense rises to the level of a federal constitutional violation for which habeas relief is available.  The threshold question is whether the petitioner was entitled to the omitted instruction under state law.  See <u>Davis</u>, 270 F.3d at 124; <u>see also</u> <u>Jackson v.</u> <u>Edwards</u>, 404 F.3d 612, 621 (2d Cir. 2005)(citing <u>Davis</u>, 270 F.3d at 124).  If a petitioner cannot establish that state law entitled him or her to the omitted instruction, then he or she has necessarily failed to allege a deprivation of due process, and the claim must be denied.  See <u>Rice</u> <u>v. Hoke</u>, 846 F.2d 160, 165 – 66 (2d Cir. 1988)(denying habeas claim alleging failure to instruct on lesser included offenses in noncapital case because petitioner had not established he was entitled under New York law to the instruction, without reaching whether petitioner had a federal constitutional right to that instruction).  However, if the trial court failed to instruct the jury on a defense to which the petitioner was entitled under state law, the next question is whether that state law error was so severe as to violate due process.[8] <u>Davis</u>, 270 F.3d at 124.  Third, if the

---

[8]The habeas claims at issue in both <u>Davis</u> and <u>Jackson</u> resulted from the state courts' failure to instruct the juries on the defense of justification even though the petitioners were entitled to the instructions under New York State law. See <u>Davis</u>, 270 F.3d at 116; <u>Jackson</u>, 404 F.3d at 618.  Although, under New York State law, extreme emotional disturbance is an "affirmative defense" and justification is a "defense," this Circuit has implied, in an unpublished decision, that a denial of an affirmative defense to which a defendant is entitled under state law may violate due process, and has applied the same three-step test in <u>Davis</u> to such a claim. See <u>Vega v. Walsh</u>, 258 Fed.Appx. 356, 357 - 58 (2d Cir. 2007)(denying habeas petitioner's due process challenge to failure to give instruction on affirmative defense of entrapment by applying <u>Davis</u>); <u>see also</u> <u>Nylander v. Smith</u>, No. 07–CV–0457 (SLT), 2010 WL 1292297, at *7 - *8

error did violate due process, the habeas court must determine whether the state court's rejection

of the claim was contrary to or an unreasonable application of clearly established federal law in

order to decide whether habeas relief should be granted.  Id.

Petitioner's claim here fails on the first prong of this test: he has not established that the

state court, in denying his request for an instruction on the affirmative defense of extreme

emotional disturbance, made any error of state law, let alone one so severe that it deprived him

of a fundamentally fair trial.  Under New York Penal Law § 125.25(1)(a), ". . . it is an

affirmative defense [to the crime of intentional murder in the second degree] that . . . [t]he

defendant acted under the influence of extreme emotional disturbance for which there was a

reasonable explanation or excuse, the reasonableness of which is to be determined from the

viewpoint of a person in the defendant's situation under the circumstances as the defendant

believed them to be."  A defendant who committed a homicide and successfully establishes this

---

(E.D.N.Y. Mar. 30, 2010)(applying Vega and Davis to habeas claim of due process violation
from failure to give extreme emotional disturbance instruction).  (The Court has provided
Petitioner with copies of unpublished decisions or decisions available only on an electronic
database which are cited herein, as suggested by Lebron v. Sanders, 557 F.3d 76, 77 (2d Cir.
2009)).  Moreover, Davis states that "a finding that the petitioner was erroneously deprived of a
jury instruction to which he was entitled under state law is the first step in the determination
whether that error violated the petitioner's federal due process rights," and does not appear to
restrict that holding to jury instructions on the justification defense.  270 F.3d at 123.  Therefore,
I apply the three-step test in Davis to Petitioner's challenge to the trial court's refusal to instruct
on the affirmative defense of extreme emotional disturbance to determine whether he has stated
a due process violation cognizable on habeas review.  Other courts in this Circuit have done the
same.  See Petty v. Connolly, No. 07 Civ. 6090(WHP), 2011 WL 3611207, at *2 - *3 (S.D.N.Y.
Aug. 15, 2011)(applying Davis and Jackson to due process claim arising from failure to charge
extreme emotional disturbance); Buckner v. Burge, No. 06–CV–1180 (SLT)(CLP), 2010 WL
1328982, at * 4 - *5 (E.D.N.Y. Mar. 31, 2010)(same); Smith v. Perez, 722 F.Supp.2d 356, 379
(W.D.N.Y. 2010); Wilson v. Phillips, No. 05–CV–1208–ENV, 2010 WL 545862, at *6
(E.D.N.Y. Feb. 16, 2010); see also Zamora v. Phillips, No. 04-CV-4093 (JFB), 2006 WL
2265079, at * 4 - *5 (E.D.N.Y. Aug. 8, 2006)(denying habeas petitioner's due process challenge
to failure to give extreme emotional disturbance instruction because evidence did not support
that charge).

28

defense is guilty of manslaughter, not murder in the second degree.  N.Y. Penal Law §

125.20(2).  To establish this defense, a defendant must prove two elements: (1) "that he or she

acted under the influence of an extreme emotional disturbance" and (2) "that there was a

reasonable explanation or excuse for that disturbance."  People v. Roche, 98 N.Y.2d 70, 75 - 76

(2002).  In order to satisfy the first, subjective element, the defendant must provide evidence that

"he or she suffered from a mental infirmity not rising to the level of insanity at the time of the

homicide, typically manifested by a loss of self-control."  Id. at 75.  In order to establish the

second element, a defendant must show that, in light of the "subjective, internal situation in

which the defendant found himself [or herself] and the external circumstances as he [or she]

perceived them at the time, however inaccurate that perception may have been," the defendant's

explanation for his or her emotional disturbance was reasonable.  People v. Casassa, 49 N.Y.2d

668, 679 (1980).

      In order for a defendant to be entitled to a jury charge on this defense, "a court must

determine that sufficient credible evidence has been presented for the jury to find, by a

preponderance of the evidence, that the elements of the affirmative defense have been

established."  People v. White, 79 N.Y.2d 900, 902 - 03 (1992).  Although a defendant who

pursues inconsistent defenses at trial, or who does not present psychiatric testimony in support of

his or her claim of extreme emotional disturbance, is not foreclosed from asserting this defense,

those factors affect whether the defendant has established sufficient evidence to entitle him or

her to the charge.  See Roche, 98 N.Y.2d at 76.

      Petitioner argues that he was entitled to a jury charge on this defense because "at least

some of the evidence" adduced at trial supports his current story of the crime: "a man, still in

love with his girlfriend, sees her with a new man, and upon being confronted with the rumpled

bedclothes of their bed, snaps, attacking them both." Second Am. Pet. 15.   Specifically, he contends that the testimony of the taxi driver who took him to Bishop's apartment that morning, Petitioner's own statements to police immediately following his apprehension, and Neville's testimony presented sufficient evidence to satisfy both elements of the defense. Id. at 17. Petitioner points to both his and Neville's trial testimony for the proposition that he was unaware of Neville's relationship with Bishop until he came to her apartment, a proposition which could ostensibly support the reasonableness of his explanation for the intensity of Petitioner's reaction. Id. at 17 - 18.

Petitioner points to three categories of evidence which he alleges should have entitled him to an instruction on extreme emotional disturbance: Bridge's and Neville's trial testimony and Petitioner's statements to police after his arrest.  I describe each in turn, as well as Petitioner's own testimony at trial, to determine whether Petitioner was entitled to the requested instruction under New York State law.

(1)      Winston Bridge's Trial Testimony

Winston Bridge, the taxi driver who took Petitioner from his home to Bishop's apartment on the morning of March 29, 2002, testified about the conversation that took place between him and Petitioner en route to Bishop's apartment.  T: 1023.  When Bridge picked up Petitioner, Bridge already had another passenger in his cab.  T: 1026.  After Petitioner entered the cab, Bridge and the first passenger discussed a mutual acquaintance, and Bridge told the passenger that their mutual acquaintance "left a guy for somebody else."  Id.  After the first passenger exited the cab, Petitioner told Bridge, "that's the way my girl is."  T: 1027.  Bridge testified that Petitioner "said at the time when he was working he was taking care of her and he lost his job, so she got into some money and she's trying to push him away, she don't want to see him no more."

Id. Because Petitioner seemed "upset" and "confused," Bridge suggested he talk to a preacher.
T: 1029.

(2)     Petitioner's Oral and Written Statements to Police

Petitioner made a variety of spontaneous oral statements to police after his arrest, and
various police officers testified as to his demeanor after he was taken into custody.  Former
Mount Vernon Police Officer Roy Haney, who observed Petitioner shortly after his arrest at the
Mount Vernon Police Station, testified that he appeared "upset" and "nervous" at the station.  T:
880.  Mount Vernon Police Officer Paloma Ramos-Tapia, who was one of the officers
transporting Petitioner from the scene of his arrest to the police station, testified that in the patrol
car en route to the station he was "upset" and "agitated."  T: 1020.  During cross-examination,
Petitioner testified that he made statements to police during that trip, as captured by a video
recorder in the patrol car.[9]  T: 1878.  He admitted that during that trip, he told police, "I just want
someone to talk to, I just want someone to talk to," that he wished "someone could feel what [he
was] going through."  Id.  He told the officers that he didn't "want to seem like a pussy," but that
he wanted someone to talk to because he was "not stable."  T: 1878 - 79.  He asked them if they
ever felt "like everything is going wrong for [them]."  T: 1879.

Petitioner also spoke to the officers transporting him from the Mount Vernon Police
Station to the Yonkers Police Station.  Yonkers Detective Vincent Starkey, who transported
Petitioner between police stations, testified that during the drive, Petitioner stated that he
intended to shoot Neville but had hit Bishop by accident.  T: 1190.  Petitioner complained to

---

[9]The video was admitted into evidence at trial, T: 1001, but the Court has not been
provided with a copy of it.  However, a copy of the video is not necessary for me to evaluate the
merits of Petitioner's claim.

31

Starkey that he had put Bishop's bed together but Bishop had let Neville sleep in it with her, and told Starkey that he "wanted to get his story out." T: 1190 - 91. Petitioner also told him that he had attempted to shoot Neville because Neville was going to shoot him first. T: 1214. Starkey also testified that Petitioner did not appear upset or nervous. T: 1211, 1214. Yonkers Detective James McCabe, who was also in the car transporting Petitioner from Mount Vernon to Yonkers, corroborated Starkey's testimony as to Petitioner's statements in the car. T: 1431 - 32. McCabe described Petitioner's demeanor during the car ride as "excited." T: 1492. Petitioner was advised of his Miranda rights at the Yonkers station and signed a statement to that effect. T: 1435 - 36. McCabe testified that Petitioner told the detectives he wished to speak further with them after being advised of his rights. T: 1438. Detective McCabe and another Yonkers detective, Detective Marvin Oakley, then conducted what McCabe described as a "cordial" interview. T: 1439, 1444. McCabe testified that Petitioner "became more relaxed as the interview went on," and was "very calm." T: 1508.

Following the interview, Detective McCabe prepared a written statement based on the information elicited from Petitioner during the interview, which Petitioner reviewed and signed. T: 1448. The written statement was admitted into evidence as People's Exhibit 49, T: 1449, and Detective McCabe also read the statement aloud to the jury. T: 1451 - 1459. In his written statement,[10] Petitioner asserted that he had gone to Bishop's apartment because he had been unable to reach her by phone and had become concerned. T: 1453 - 54. Although she had given him keys to her apartment, he was unable to use them to open her door, so went to search for the

---

[10]The Court has not been provided with a copy of the written statement itself, but has the transcript of McCabe's testimony in which he read the statement aloud. Petitioner's testimony challenging the contents of that statement is described in Section (4), infra.

building's superintendent to let him in, but could not find him.  T: 1454.  While in the building's lobby, a black male wearing a white t-shirt asked Petitioner who he was looking for.  T: 1455. When Petitioner told the man he was looking for "Chantay" and asked who he was, the man replied, "I am the new boyfriend," and told Petitioner to leave.  Id.  When Petitioner stated he wanted to see Bishop and would leave if she asked him to, the man relented, but asked Petitioner to "keep your distance."  Id.

As soon as Bishop let him in the apartment, Petitioner saw the rumpled bed, and asked Bishop if she was "sleeping with someone in the bed."  T: 1456.  Petitioner stated that he and the man who had referred to himself as Bishop's new boyfriend "started getting loud with each other."  Id.  The man then reached for what Petitioner thought was a gun, but before he could pull out the weapon, Petitioner preemptively fired two shots at him.  Id.  Petitioner stated that as the man ran out of the apartment, he "tried to get passed [sic] Chantay and go behind her."  Id. Petitioner "kept [his] finger on the trigger.  The gun kept going off."  T: 1457.  Two shots hit Bishop.  Id.  Even though the new boyfriend fled the apartment after the first two shots missed him, and Petitioner could see he had hit Bishop, Petitioner's gun "was still firing shots;" as she fell to the bathroom floor, Petitioner had the gun pointed in her direction.  Id.  Bishop told him to call the police and for an ambulance, but he did not.  Id.  Instead, Petitioner ran from the apartment and returned home.  T: 1457.

Then, afraid that the new boyfriend and his friends would come seeking revenge, Petitioner dug up some guns he had buried in his backyard, told his family that he had "shot Chantay," and took off on foot.  T: 1457 - 58.  While on foot, he "got [his] thoughts together" and decided to throw the guns "in the water" in the Bronx, but before he could do so, he was arrested.  T: 1458 - 59.

33

Finally, Detective Oakley, who interviewed Petitioner with McCabe, also testified. T:
1546. He described Petitioner's initial demeanor prior to the interview as "very, very agitated
and saying he wanted to tell us what happened." T: 1550. Oakley testified that he and McCabe
"told him to relax" and gave him <u>Miranda</u> warnings. T: 1551. Oakley also testified that at some
point during the interview, Petitioner began repeatedly "whining" Bishop's name. T: 1583.
Despite the outburst, Oakley testified he "couldn't say [Petitioner was] upset." <u>Id.</u>

(3)    <u>Ronald Neville's Trial Testimony</u>

Neville testified that he and Bishop had spent the night of March 28, 2002, the night
before the murder, at her apartment. T: 1244 - 49. That night, Neville testified that he and
Bishop each had a beer, smoked marijuana, and watched a movie. T: 1246 - 48. The next
morning, Neville and Bishop were awakened by Petitioner banging on the windows of the
apartment. T: 1249. They then heard someone rattling the front door of the apartment, trying
the locks, which had been recently changed. T: 1250. Fed up with Petitioner's intrusive tactics,
Neville left the apartment to look for Petitioner, and found him seated in the building's lobby. T:
1250 - 51. It was the first time Neville and Petitioner had met. T: 1253. When Neville learned
that Petitioner was Bishop's former boyfriend, Neville told him that he and Bishop were now
dating. T: 1338 - 39. Neville testified that he and Petitioner then had a "mellow" conversation
in which Neville sympathized with Petitioner over the difficulty of ending a relationship and told
Petitioner he should "move on." T: 1254, 1338 - 39. Neville characterized the exchange as "so
peaceful." T: 1339. Petitioner then told Neville, "I just want to talk to her. Tell her I'm happy
for her." T: 1253. Neville, persuaded Petitioner was sincere, agreed to let Petitioner talk to
Bishop, shook his hand, and took him back to Bishop's apartment. T: 1254 - 1255.

Once inside the apartment, however, Petitioner did not, in fact, tell Bishop he was happy

34

about her new relationship with Neville. Instead, Neville testified that Petitioner asked Bishop, "why you do this to me[?] How you do this to me [?]" T: 1257. Neville testified, though, that "at the time, everybody was calm." Id. When Petitioner began to approach Bishop, Neville placed his hand between them and asked Petitioner to back up. Id. In response, Petitioner stated "he wasn't going to do nothing." Id. However, when Petitioner looked into the bedroom, he saw the rumpled sheets, said to Bishop, "[Y]ou got him sleeping in the bed I put together," and shot at Neville. T: 1259. Neville first dropped to the ground, then sprinted from the apartment. T: 1260 - 62. The last time he saw Bishop, she had retreated to the bathroom and had closed the bathroom door. T: 1262. Neville heard three shots fired as he ran from the building to his car. T: 1263. As Neville circled the block, he saw Petitioner walking away from the building, so he parked and returned to the apartment to find police already at the scene. T: 1263 - 64.

(4)    Petitioner's Trial Testimony

Although Petitioner only points to his statements to police and Bridge's and Neville's testimony as support for the claim that he was entitled to this jury instruction, I also include a summary of Petitioner's testimony to provide a fuller picture of the evidence adduced at trial, and to show that Petitioner's testimony, if anything, militated against an instruction on this defense.

Petitioner testified that at the time of Bishop's death, he and Bishop had been dating for four years, and that on Saturday, March 29, 2002, Bishop was his girlfriend. T: 1734. According to Petitioner, the prior Monday, he and Bishop had agreed that on March 29, 2002, he and she would move their clothes into Bishop's apartment. T: 1740. When Petitioner called Bishop's mother's house that morning, and learned Bishop was not there, he assumed she was at her apartment, so took a cab there. T: 1742. Petitioner testified that his conversation with Bridge during that cab ride was a discussion of the "little problems" in his relationship with

35

Bishop. Id. Petitioner explained that he took a gun with him that morning because he had been

shot at earlier in the week. T: 1743. Petitioner testified that upon his arrival, he first tried to

unlock the door of Bishop's apartment, but when he was unable to do so, went outside and

knocked on her windows. T: 1744 - 45. When no one responded, he attempted to unlock her

door again. T: 1746. Petitioner testified that he assumed his keys did not unlock the door

because someone had locked it from the inside, and became concerned when no one responded

to his knocks. T: 1744, 1746. Petitioner then tried to find the building superintendent, but could

not locate him, so waited in the lobby. T: 1746 - 47.

Petitioner testified that while he was waiting there, a man he later learned was Neville

approached him and asked who he was. T: 1747. Petitioner responded, "I'm Chantay's

boyfriend, who are you[?]" Id. Petitioner's description of his conversation with Neville

corroborated Neville's; Petitioner testified that Neville informed him Neville was Bishop's new

boyfriend, and that Neville commiserated with Petitioner about "how it feels to have somebody

that you love and then you lose her." T: 1748. Neville asked Petitioner for the keys Petitioner

had to the apartment, but Petitioner told him he would prefer to return them to Bishop. T: 1749.

Petitioner testified that he told Neville, "[I]f Chantay chooses to be with you, there ain't no

problem," and that they shook hands. Id. Petitioner testified that he felt "confused" when

Neville told him he was Bishop's new boyfriend. Id. Petitioner testified that Neville frisked

him (unsuccessfully) before letting him into Bishop's apartment. T: 1750 - 51.

According to Petitioner, once in the apartment, Petitioner tried to talk to Bishop, but

Neville would only let him speak to Bishop from a distance. T: 1751. Petitioner asked Bishop

why she would make plans with him but have another man there, T: 1832; Bishop began crying

and told him she was "sorry" and "confused." T: 1752. Petitioner asked Bishop if she wanted to

36

discuss "what's going on" somewhere else, and she agreed to leave with him as soon as she got dressed. T: 1753.

Petitioner testified that Neville then became "agitated" that Bishop was about to leave with Petitioner. T: 1754 - 55. According to Petitioner, Neville then lifted up his shirt to reveal a gun. T: 1755. When Neville reached for the gun, Petitioner fired his gun, "to protect myself and Chantay," T: 1756, by scaring Neville. T: 1761. Petitioner testified that he remembered "nothing" after firing three shots at Neville, but that he did not intentionally aim at Bishop. T: 1762.

After Neville ran from the apartment, Petitioner went to the bathroom to check on Bishop, who was bleeding on the ground. T: 1764. Bishop told him to get help. Id. As Bishop's apartment had no phone, Petitioner ran from the building to get help, but as he was running to a nearby store to call 9 - 1 - 1, he saw emergency vehicles and heard sirens. T: 1765 - 66. Petitioner "panicked," as he knew he had just shot Bishop, and did not call 9 - 1 - 1; instead he called a cab for himself to go home. T: 1766 - 67. (In fact, on re-direct examination, Petitioner testified that he did not go directly home, but took the cab to another store so he could purchase cigarettes first. T: 1937.) Once he arrived at home, he told his sister what happened, T: 1768, grabbed a bulletproof vest and two more guns, and left his house, scared that Neville and his friends would come find him and exact revenge. T: 1767 - 69.

After Petitioner was apprehended, during his transport from Mount Vernon to Yonkers, he felt "upset" and "wasn't stable." T: 1774. He testified he was worried during the drive about Bishop's safety, although he admitted he did not ask about her condition until five minutes into his interview with police. Id. Petitioner also testified that he had asked for an attorney prior to giving a statement, but the police persuaded him to make a statement without one. T: 1776 - 77.

He claimed he was not given his <u>Miranda</u> warnings until after he made a statement.  T: 1779.

Petitioner testified that his written statement did not accurately reflect what he told police during the interview in multiple ways.  For instance, in his written statement, Petitioner stated that he told Neville when they spoke in the lobby of Bishop's building that if Bishop wanted him to leave after they spoke, he would do so.  T: 1900.  However, at trial, Petitioner testified that he had not promised to leave, or made a statement to that effect to police.  T: 1901.  He testified at trial that, contrary to the contents of his statement, he did not ask Bishop if she was "sleeping with someone in that bed."  T: 1902.  Petitioner stated that he had not identified the kind of gun he used that day to the police, although its make was included in the statement.  T: 1904.  The sentences "I kept my finger on the trigger and the gun kept going off" and "I had the gun pointed in her direction, the gun was still firing shots" were "police words, not mine."  T: 1782.  Petitioner testified at trial that he did not remember shooting Bishop.  T: 1881.  The statement omitted the fact that Petitioner went to the store to call for help.  T: 1782.  In Petitioner's written statement, he asserted that he had dug up the weapons from his backyard, but he testified that in fact he recovered them from beneath his bed; he testified that he had initially lied to the police about the guns' location to protect his family.  T: 1784.  Petitioner also testified that he did not tell police that his intention after taking the guns from his family's house was to throw them in the water, even though that assertion was contained in his statement.  T: 1911.

Taken as a whole, and even when viewed in the light most favorable to Petitioner, <u>see</u> <u>People v. Moye</u>, 66 N.Y.2d 887, 889 (1985), the evidence adduced at trial does not support a charge of extreme emotional disturbance.  Bridge's testimony suggests, at most, that Petitioner was "upset" and "confused" about his deteriorating relationship with Bishop before he discovered her supposed unfaithfulness.  T: 1029.  Various police officers testified that Petitioner

38

appeared "upset" and "nervous" or "agitated" following his arrest.  T: 880, 1020.  Petitioner's

statements to police immediately after his apprehension, statements which Petitioner specifically

highlights as evidence that he experienced an extreme emotional disturbance, reflect that

Petitioner felt, at worst, "not stable" after the shooting.  T: 1879.  Those statements also

demonstrate that Petitioner was anxious, almost as soon as he was apprehended, to "get his story

out" that he had accidentally shot Bishop while defending himself from Neville.  T: 1190 - 91,

1214, 1431 - 32.  Petitioner's own testimony merely expounds upon his initial claim of self-

defense, as Petitioner appears to recognize.  Second Am. Pet. at 17 - 18.  He explains this

omission as the result of his need to "avoid[] confronting the feelings invoked by seeing tangible

evidence that the woman he still thought of as his girlfriend had another boyfriend," id. at 17, but

that explanation is immaterial to the question of whether the evidence adduced at trial supported

the desired instruction.  Although Neville's testimony contradicts Petitioner's self-defense claim,

Neville testified that Petitioner shot Bishop because he became angry that she was sleeping with

someone else, T: 1259, so Neville's testimony also does not provide evidence that Petitioner

experienced the requisite loss of control for the instruction.

   Thus, evidence adduced at trial supports the inference that Petitioner shot Bishop because

he was angry.  However, emotions like "anger or embarrassment" are not extreme enough to

constitute the loss of self-control required for extreme emotional disturbance.  People v. Walker,

64 N.Y.2d 741, 743 (1984).  Petitioner did not present psychiatric testimony.  His own

testimony, and his statements to police, focused on justification, an alternative theory of the

crime which was flatly inconsistent with the notion that he had lost control of his actions.  As the

Court of Appeals noted, although failure to present psychiatric evidence or the pursuit of an

alternative, inconsistent theory of the case does not foreclose an instruction on extreme

39

emotional disturbance, they do have a negative impact on the sufficiency of the evidence in favor of such an instruction. Thus, Petitioner has not established that the state court erred in denying his request for an instruction on this defense, let alone made an error of federal constitutional dimension. Petitioner has therefore failed to state a claim cognizable on habeas review, and I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied.

## III.  CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the instant Petition should be dismissed.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) working days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Nelson Roman, at the United States District Court, Southern District of New York, United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Roman.

Dated: July 16, 2013
      White Plains, NY

                            Respectfully submitted,

                            LISA MARGARET SMITH
                            United States Magistrate Judge
                            Southern District of New York

A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Nelson Roman, U.S.D.J.

Dwayne Reed
03-A-3901
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589

John J. Sergi
Laurie G. Sapakoff
Westchester County District Attorney
111 Dr. Martin Luther King, Jr. Blvd.
White Plains, NY 10601